SCOTT ERIK ASPHAUG, OSB #833674
United States Attorney
District of Oregon
**CLAIRE M. FAY, DCB #358218**
Assistant United States Attorney
Claire.Fay@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## [PORTLAND DIVISION]

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:21-cr-00197-HZ** |
| **v.** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **MELODIE A. ECKLAND,** | |
| **Defendant.** | **Sentencing: January 19, 2022**<br>**At 2:00 p.m.** |

## I.     INTRODUCTION

Defendant Melodie A. Eckland used manipulation, lies, and deceit to steal the identity of her employer, and to defraud numerous people and entities out of more than $1.5 million. Her victims include her adoption agency employer and its owners, a bank, a credit company, family members, and the Internal Revenue Service. Eckland's extremely egregious conduct warrants a sentence of 37 months in prison for her Wire Fraud and Tax Fraud convictions and a mandatory

consecutive 24-month sentence for her identity theft conviction, for a total prison sentence of 61 months. The Court should also order full payment of restitution to her victims in the amount of $1,612,133.87.

At sentencing, the Court will have to resolve several matters: whether the counts of conviction should be grouped or not grouped, and the resulting appropriate Offense Level and guideline range; the appropriate sentence under 18 U.S.C. § 3553(a); and whether the Court should impose recommended special conditions relating to possessing computers and electronic devices and approval of employment by the probation officer.

## II. STATUS OF THE CASE

On June 2, 2021, Eckland was charged in a four-count Information with one count of Wire Fraud in violation of 18 U.S.C. § 1343; one count of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A; one count of Making and Subscribing a False Income Tax Return for the calendar year 2017, in violation of 26 U.S.C. § 7206(1); one count of Failure to Account For and Pay Over Withholding and FICA Taxes, in violation of 26 U.S.C. § 7202; and a forfeiture allegation related to the Wire Fraud charge (ECF No. 1).

On June 29, 2021, pursuant to a written plea agreement, Eckland plead guilty to each count of the Information (ECF Nos. 9-11). The Preliminary Order of Forfeiture and Money Judgment, and Final Order of Forfeiture was signed by the Court on this date (ECF No. 12).

Sentencing is scheduled for January 19, 2021, at 2:00 p.m. (ECF No. 15). Defendant is on release while awaiting sentencing.

/ / /

/ / /

### III.   THE OFFENSE CONDUCT AND RELEVANT CONDUCT

The government concurs with the facts recited in the PSR. From at least 2011 to April 2018, defendant Eckland resided in Hillsboro, Oregon and worked as the bookkeeper for an adoption agency owned by Adult Victims 1 and 2 (hereinafter AV1 and AV2). The adoption agency, which was incorporated in 1993, was a non-profit adoption and surrogacy agency operating in Oregon and Washington. As the agency's bookkeeper, defendant was charged with maintaining the books and records of the agency, doing the payroll for agency employees, filing employment tax returns of the adoption agency with the IRS, and paying the quarterly employment taxes to the IRS. Defendant also provided financial statements of the adoption agency to the Board of Directors but did not have signatory authority over the business bank account (PSR ¶ 20).

Defendant's fraudulent scheme came to light in March 2018, when one of the agency's owners received a call from a Premier Community Bank representative inquiring about several business checks that had been presented for payment with a signature of the owner that appeared to be forged (PSR ¶ 21). Initially, when confronted by the agency's owner, defendant lied about the forged checks, claiming that someone had hacked her bank account through an ATM and had taken out loans. The following day, defendant admitted that she had taken out a loan in the adoption agency's name and that payments were supposed to come from her personal bank account (PSR ¶ 22). Defendant's entire fraud scheme unraveled from there.

Over the course of seven years, Eckland defrauded the adoption agency, AV1 and AV2, by lying, stealing, making materially false and fraudulent representations about the agency's bank account and business records, and altering the agency's business records to cover her

tracks. As part of the fraud scheme, Eckland stole funds directly from the adoption agency's business bank account at Premier Community Bank by using the business' computer to make unauthorized wire transfers to her personal bank account at U.S. Bank, and by writing unauthorized checks to herself. Defendant also transferred via computer, unauthorized funds in the form of "bonuses" from the adoption agency's bank account to her own bank account. Bank records revealed that over the course of the scheme, Eckland made approximately 186 unauthorized wire transfers of funds from the agency's Premier Community Bank account to her personal account (PSR ¶ 23). One of these electronic transfers in the amount of $18,478.40 occurred on June 15, 2017, and forms the basis of the Wire Fraud charge set forth in Count 1 of the Information to which defendant plead guilty.[1]

Eckland manipulated the agency's books and records by maintaining two separate QuickBooks files on the adoption agency's computer. This was an integral part of defendant's fraud scheme and afforded her the opportunity to carry on the scheme for seven years. One version showed the business books as they should have been maintained. Defendant used this false QuickBooks file to provide financial statements to the Board of Directors and to the business accountants. A separate version of the QuickBooks file that Eckland created showed the true condition of the books and the payments she made to herself over the course of her employment. In the second set of QuickBooks, defendant most frequently categorized the excess payments she made to herself as "Misc II." Eckland also used an account in QuickBooks that she labeled "Bonus" to classify additional payments to herself (PSR ¶ 24).

---

[1] A small portion of the $18,478.40 was defendant's legitimate salary. Most of the money represented stolen funds.

Stealing via electronic transfers wasn't enough for defendant. Between December 2017 and March 2018, Eckland also wrote approximately $22,500 in checks to herself on the adoption agency's bank account at Premier Community Bank. Defendant forged the signature of adoption agency owner AV1 on the checks, deposited or cashed them, and took the money for her personal use. Premier Community Bank suffered a loss of $16,000, while the adoption agency lost $6,500 on these unauthorized forged checks because the bank could not cancel payment in time (PSR ¶ 25). These facts form the basis of the Aggravated Identity Theft charge that defendant plead guilty to in Count 2 of the Information.

Total losses from the "Misc II" and "Bonus" Quickbooks accounts and the defendant's use of the forged checks from the adoption agency bank account totaled more than $1,063,000 (PSR ¶ 26).

As part of her fraud scheme, Eckland also made unauthorized charges of approximately $32,500 to the PayPal credit card account of one of the adoption agency owners, AV2. Eckland had transferred these funds to her personal bank account. AV2 contested the charges, and PayPal wrote off these charges and took the $32,500 loss (PSR ¶ 27).

To conceal her theft from the agency owners, Eckland applied for and obtained loans in the name of the adoption agency from at least five lending agencies in 2016 and 2017. Defendant obtained the loans without AV1 or AV2's approval and made unauthorized pledges of the agency's receivables to secure these loans. Using the business' computer, Eckland systematically altered the records of the adoption agency, making it appear as though she was the owner/president of the agency and a person authorized to enter into loan agreements on behalf of the agency (PSR ¶ 28). Defendant emailed these false records to the lenders. Eckland used the

funds from these loans to cover the amounts of money she had stolen from the adoption agency's bank accounts. These receivable loans had a devastating effect on the adoption agency's business bank account since the lenders were taking daily payments directly out of the agency's account.

Defendant found that she needed more and more money to conceal her theft, so as part of her fraud scheme, Eckland brazenly stole funds from the Umpqua Bank account opened on behalf of the estate of her deceased brother-in-law (PSR ¶ 29). In December 2015, defendant's brother-in-law passed away, and defendant's husband was made the trustee and executor of the estate. Defendant Eckland assisted her husband with these duties. As part of his duties, defendant's husband was tasked with selling the assets of his deceased brother, paying estate bills, and preserving the remaining funds in an estate bank account for the benefit of his brother's children, AV3 and AV4. The only authorized signor on the estate bank account was defendant's husband. Defendant Eckland had access to the estate bank account, and embezzled funds from the account by making unauthorized transfers of funds to herself via electronic funds transfers, by altering hard copies of checks, and by forging her husband's signature on unauthorized checks and cashing or depositing the checks (PSR ¶¶ 29-30). To conceal her theft from the adoption agency and its owners, Eckland transferred some of the stolen funds from the estate account to the adoption agency's bank account. Defendant stole approximately $123,900 from the estate bank account at Umpqua Bank (PSR ¶ 31).[2]

---

[2] Travelers Casualty and Surety Company of America reimbursed AV3 and AV4 for the sums that Eckland stole from the estate, so Travelers Insurance Company should be listed as a victim for restitution purposes. Defendant and her husband have repaid $30,000 of the amount she owes to Travelers. Restitution due to Travelers Insurance company is $93,900.

Internal Revenue Service records show that defendant Eckland willfully filed joint federal income tax returns with her husband for the calendar years 2013, 2014, and 2017. Eckland signed these returns under penalties of perjury. IRS records reflect that defendant did not report any of the embezzled funds on her federal income tax returns for the calendar years 2013, 2014, and 2017. Defendant filed a 2015 and 2016 federal income tax return and reported $226,500 in 2015 and $225,000 in 2016 as "Other Income" but failed to pay the taxes due. To conceal her income from the IRS, defendant willfully did the following: prepared and maintained false business books and records of the adoption agency on the business computer; diverted funds from the bank account of the adoption agency to her personal account by making unauthorized transfers via interstate wire; made unauthorized applications for loans in the name of a nominee, i.e. the adoption agency; made unauthorized withdrawals from the business bank account by using the identity of another person, i.e. AV1; made unauthorized purchases on a business credit card using the name of another person, i.e. AV2; and made unauthorized withdrawals from the estate bank account by forging the name of the account holder, i.e. her husband (PSR ¶¶ 33-34). These actions form the basis of Count 3 of the Information. The amount of unreported income and additional tax due and owing regarding defendant's personal income tax returns is reflected in the chart below:

| Calendar Year | Unreported Income | Additional Tax Due and Owing |
| --- | --- | --- |
| 2013 | $227,050 | $64,724 |
| 2014 | $108,615 | $26,465 |
| 2015 | $0 | $81,263 |
| 2016 | $60,000 | $91,258 |
| 2017 | $279,676 | $81,772 |
| **TOTAL** | **$675,341** | **$345,482** |

/ / /

As part of her duties at the adoption agency, defendant Eckland was assigned the task of preparing and filing the adoption agency's quarterly employment tax returns with the IRS. Internal Revenue Service records show that beginning in the second quarter of 2016, and lasting through the fourth quarter of 2017, Eckland ceased making the employment tax deposits for the adoption agency and stopped filing the employment tax returns (Forms 941). It was easier to cover her tracks if there was no record of the amount of employment taxes due. Eckland had also depleted the agency's bank account, so she also knew there likely was insufficient funds for her to pay the taxes. Defendant's failure to pay the agency's employment taxes for the second quarter of 2016 through the fourth quarter of 2017 form the basis of Count 4 of the Information to which she has plead guilty. As a result of Eckland's willful conduct and her theft of funds, the adoption agency owes the IRS $94,361.04 in past due employment taxes (excluding penalties and interest) for the second quarter of 2016 through the fourth quarter of 2017 (PSR ¶ 35). This amount is included in the agency's loss figure above. However, the defendant also owes additional restitution of $60,885.39 to the IRS for the penalties and interest on the overdue employment taxes.

Eckland spent the proceeds of her multi-year theft on gifts and living expenses for her adult children, trips to Hawaii, Mexico and Disney World, event tickets, groceries, household items, and living expenses for herself (PSR ¶ 32).

As part of the plea agreement, Eckland agreed that for sentencing purposes, the amount of the loss she caused the adoption agency, the adoption agency owners AV1, AV2, Paypal, the estate of her brother-in-law, and the IRS exceeds $1,565,000. The parties agreed that restitution

/ / /

owed to the victims of the offenses may be higher than the loss for sentencing purposes (PSR ¶ 36).

## IV.    THE PLEA AGREEMENT AND GUIDELINE COMPUTATIONS

### A.  The Plea Agreement Guideline Computation

In the plea agreement, the parties agreed that Counts 1, 3, and 4 would be grouped for calculation of losses under USSG § 2B1.1 (ECF No. 11 at ¶ 9).  The resulting guideline computation per the plea agreement is as follows:

**Relevant Conduct**:  The parties agree that the following USSG provisions apply:

a.    USSG § 2B1.1(a)(1) – defendant's base offense level is 7;

b.    USSG § 2B1.1(b)(1)(I) – because the loss is more than $1,500,000 but less than $3,500,000, a 16-level increase is warranted;

c.    USSG § 2B1.1(b)(9)(A) – because the offense involved the defendant's misrepresentation that she acted on behalf of a charitable organization, a 2-level increase is warranted;

d.    USSG § 2B1.1(b)(10)(C) – because the offense involved sophisticated means, a 2-level increase is warranted;

e.    USSG § 3B1.3 – because the offense involved an abuse of a position of trust, a 2-level increase is warranted.

This resulted in a total offense level of 29.  Pursuant to the plea agreement, the government agreed to a three-level reduction for acceptance of responsibility, a two-level downward adjustment for defendant providing copies of her original and amended tax returns and meeting with the IRS, and a two-level downward adjustment under the § 3553 factors.  This resulted in a total offense level of 22, and a guideline range of 41-51 months, assuming no criminal history.  Under the plea agreement, the government would recommend 41 months in

prison for Counts 1, 3 and 4, plus the 24-month mandatory consecutive sentence, for a total prison sentence of 65 months (ECF No. 11 at ¶¶ 10-12).

**B. The PSR Guideline Calculation**

The PSR author calculated the applicable guideline range by separately calculating the losses from the Wire Fraud charge (Count 1) and the Tax Fraud losses (Counts 3 and 4) then applying the multiple count adjustment to obtain the combined adjusted offense level (PSR ¶¶ 45-69). The PSR computations for Count 1, Wire Fraud, is as follows:

| Offense Level Computation – Count 1 (Wire Fraud) | |
|---|---|
| Base—<br>USSG § 2B1.1(a)(1) | 7 |
| Loss—<br>USSG § 2B1.1(b)(1)(H)<br>more than $550,000 and less than $1,500,000 | 14 |
| Acting on Behalf of a Charity --<br>USSG § 2B1.1(b)(9)(A) | 2 |
| Sophisticated Means—<br>USSG § 2B1.1(b)(10)(C) | 2 |
| Abuse of a Position of Trust—<br>USSG § 2S1.1(2)(A) | 2 |
| **Adjusted Offense Level** | **27 (PSR ¶¶ 45-52)** |

For Count 2, Aggravated Identity Theft, 18 U.S.C. § 1028A, the advisory guideline is USSG § 2B1.6. The guideline sentence is the 24-month mandatory consecutive term required by the statute.

The PSR guideline calculation for Count 3 (Making and Subscribing a False Federal Income Tax Return) is as follows:

/ / /

| Offense Level Computation – Count 3 (Filing a False Income Tax Return) | |
|---|---|
| Base— USSG §§ 2T1.1; 2T4.1 Loss--- of more than $250,000 but less than $550,000 | 18 |
| Failure to Report Income Exceeding $10,000 from Criminal Activity— USSG § 2T1.1(b)(1) more than $550,000 and less than $1,500,000 | 2 |
| **Adjusted Offense Level** | **20 (PSR ¶¶ 54-59)** |

The PSR guideline calculation for Count 4 (Failure to Account For and Pay Over Withholding and FICA Taxes) is reflected below:

| Offense Level Computation – Count 4 (Failure to Account For and Pay Over Withholding and FICA Taxes) | |
|---|---|
| Base— USSG §§ 2T1.6; 2T4.1 Loss--- of more than $40,000 but less than $100,000 | 14 |
| **Adjusted Offense Level** | **14 (PSR ¶¶ 60-65)** |

The PSR author applied the multiple count adjustment under USSG § 3D1.4(a), (b) and (c) to the greatest of the adjusted offense levels, level 27 for the Wire Fraud count, added one level, and calculated the combined adjusted offense Level as 28 (PSR ¶¶ 66-69). The PSR author credited defendant with three levels for acceptance of responsibility under USSG § 3E1.1(a) and (b), resulting in a Total Offense Level of 25 (PSR ¶¶ 71-73). This results in a guideline range of 57-71 months in prison. The Probation Office is recommending a sentence of 36 months on Counts 1, 3, and 4 along with a mandatory consecutive 24-month sentence on Count 2 (Aggravated Identity Theft) (PSR ¶¶ 122-123; Sentencing Recommendation).

/ / /

While the plea agreement grouped Counts 1, 3, and 4 for purposes of calculating the appropriate guideline range, the government does not object to the calculation method used by the PSR author. Defendant also does not object to the Probation Office's calculation. Consequently, the government agrees that the appropriate Total Offense Level is 25 after application of the three levels for acceptance of responsibility under USSG § 3E1.1(a) and (b).

Pursuant to the plea agreement, the government recommends a two-level downward adjustment to the advisory sentencing guideline range under 18 U.S.C. § 3553, since the defendant provided the government with tax returns for specific years, met with IRS agents, and complied with their request for her to sign certain documents. In addition, the government also recommends an additional two-level downward adjustment to the advisory sentencing guideline range under the factors listed in 18 U.S.C. § 3553. This results in a Total Offense Level of 21 and a guideline range of 37-46 months in prison. The government recommends a low-end sentence of 37 months on Counts 1, 3, and 4, followed by a consecutive mandatory sentence of 24 months on Count 2, for a total prison term of 61 months.

V.      GOVERNMENT'S RECOMMENDED SENTENCE

To fashion an appropriate sentence, the Court examines both the Sentencing Guidelines and the statutory factors under 18 U.S.C. § 3553(a). Factors the Court should consider under 18 U.S.C. §3553(a) include the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence imposed to reflect: (1) the seriousness of the offense; (2) respect for the law; (3) just punishment for the offense; (4) adequate deterrence to criminal conduct; (5) protection of the public from further crimes of the

/ / /

defendant; and (6) providing the defendant with needed training, care, or treatment. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).

## 1. The Nature and Circumstances of the Offenses

The crimes that Melodie Eckland committed reveal a stunning level of greediness, deceitfulness, and callousness towards her victims. Eckland repeatedly victimized the adoption agency and its owners over the course of seven long years, bleeding the non-profit of more than $1 million. This was an agency that had been licensed since 1993 and whose mission was to help children in the United States and across the world find good homes with secure and loving families. The owners of the agency hired Eckland as the bookkeeper in 2011, and they completely trusted her. It was shocking and heartbreaking for them to learn that defendant was repeatedly stealing large sums of money from the agency that they built and loved. Eckland breached the owners' trust by systematically using the business' computer to transfer money from the agency bank account to her personal bank account. In an additional violation of trust, defendant also stole the identity of one of the agency owners and forged business checks in her name. Eckland didn't stop there, using the PayPal credit card account of the other adoption agency owner to steal even more money. To conceal her embezzlement and continue her fraud, Eckland employed her skills as a bookkeeper to create a double set of QuickBooks. She showed the phony set of books to the agency's Board of Directors and owners to hide her theft and lull them into a sense that the finances of the agency were solid. Eckland also maintained an accurate set of books to determine how much of the agency's money was available to her and to keep track of the amounts of money she stole.

/ / /

Eckland's embezzlement started slowly, but she became more and more emboldened as time progressed. Realizing that she her scam may be exposed, defendant tried to conceal her theft by assuming the identity of the adoption agency owner, using the computer to create altered ownership documentation, applying for loans online, and emailing the phony ownership documents to the lenders. Eckland promised to secure these unauthorized loans with the adoption agency's receivables. Once the lenders deposited the loans to the agency's bank account, they began to make withdrawals as repayment. A review of the agency's bank account reveals consistent daily repayments to these lenders.

Even her own family wasn't immune from defendant's fraudulent conduct. As her scheme was in danger of spiraling out of control, Eckland turned to another source to obtain funds to cover her embezzlement – the estate bank account of her deceased brother-in-law. Eckland's husband was the administrator of his brother's estate and opened a bank account to handle the financial transactions involved with settling his affairs. Defendant had access to the account and stole money from the beneficiaries of the estate – her niece and nephew – so that she could deposit the money to the adoption agency account and conceal her theft. Eckland knew she was depriving her family members of funds from their father's estate, but this fact had no impact on her behavior. Defendant stole $123,900 from the estate.

While she was busy stealing money, defendant had no time to make the employment tax deposits for the adoption agency or to file the agency's quarterly employment tax for the second quarter of 2016 through the fourth quarter of 2017. Indeed, she most likely stole and spent the withheld employment taxes on herself. As a result, the adoption agency and its owners owe $94,361.04 in past due employment taxes to the IRS exclusive of penalties and interest.

Eckland's criminal conduct was the direct cause of the IRS assessing penalties and interest on the overdue employment taxes in the amount of amount $60,885.39.

The defendant's fraud scheme paid her well. Defendant "earned" between $100,000 and $290,000 per year defrauding the adoption agency and its owners, Paypal, Premier Community Bank, and her niece and nephew. This was tax-free money for Eckland. She filed false tax returns that failed to report all her ill-gotten gain for the calendar years 2013, 2014, 2016 and 2017. She filed tax returns for 2015 and 2016 but failed to pay the taxes due. As a result of her criminal conduct, Eckland owes the IRS $345,482.00 of personal income tax.

The defendant engaged in a complex series of egregious violations of the law over a seven-year period and caused a loss to her victims of over $1.5 million. There is no one to blame for these offenses besides the defendant. The sentence imposed in this case must reflect the defendant's singular responsibility for her repeated and flagrant violations of the law.

### 2. Need for Sentence to Reflect Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense

The offenses to which defendant has pleaded guilty are serious ones. Defendant accomplished her fraud through complex means. She had the knowledge and skill to manipulate QuickBooks records to create a double set of books. She also had the knowledge and ability to alter the ownership documents of the adoption agency to apply for and receive loans to cover her embezzlement. She knew how to alter checks so that she could steal from the adoption agency bank account and the estate bank account. She sought out multiple sources from which to steal. The failure to pay over withheld employment taxes is also essentially theft. The defendant took money out of adoption agency employees' paychecks that belonged to the public fisc and put it in her own pocket instead. She enjoyed the spoils of her scheme tax-free by hiding all her ill-

gotten gain from the IRS. The multifariousness of the defendant's misconduct calls out for a sentence that reflects the seriousness of her crimes and that promotes respect for the law.

The owners of the adoption agency are devastated by defendant's embezzlement and identity theft. They worked hard for 26 years to fulfill an important mission – helping children across the world find caring and loving families. However, because of defendant's theft, selfishness, and greed, the owners feel that they can no longer financially continue with the adoption agency.

A 37-month term of incarceration for Counts 1, 3, and 4 along with a mandatory consecutive 24-month sentence on Count 2, for a total sentence of 61 months in prison accounts for the nature and seriousness of the offense and the "life-destroying impacts" these frauds have on victims. *United States v. Christensen*, 732 F.3d 1094, 1104 (9th Cir. 2013).[3]

### 3. Respect for the Law; Just Punishment for the Offenses; Adequate Deterrence and Protection of the Public; Providing Defendant Needed Treatment

This Court must consider a sentence that promotes respect for the law; just punishment for the offenses; adequate deterrence and protection of the public; and that provides defendant with any needed treatment. While a total sentence of 61 months may be a significant one for a first offender, it is an appropriate one. The government's recommendation will take Eckland out of society for a substantial period and deter her from continuing her embezzling and tax cheating. It is a just sentence for someone who engaged in a complex, multi-year scheme to steal money

---

[3] At least one of the victims has indicated that they plan to attend the sentencing hearing and they may wish to address the court. The Crime Victim's Rights Act, 18 U.S.C. § 3771, enumerates victims' rights to meaningful participation in criminal proceedings. Those rights include the right to allocution placing them on the "same footing" as the defense and the prosecution. *Kenna v. U.S. Dist. Court for the CDCA*, 435 F.3d 1011, 1016-17 (9th Cir. 2006).

from her employer, a bank, a credit company and her family; steal the identity of her employer; and steal taxes due to the IRS. A total sentence of 61 months in prison will deter defendant and others. It sends a message that cheating people and the IRS out of more than $1.5 million bears very serious consequences and simply won't be tolerated.

## VI.    RESTITUTION

Restitution in this case is governed by the Mandatory Victim Restitution Act of 1996, 18 U.S. C. § 3663A, which requires a district court to "order a defendant to make restitution to a victim of certain specified offenses." *United States v. Eyraud*, 809 F.3d 462, 466 (9th Cir. 2015), citing *United States v. Anderson*, 741 F.3d 938, 951 (9th Cir. 2013) (citation omitted). The amount of restitution is limited to the victim's "actual losses" that are the direct and proximate result of defendant's offense." *Id*., citing *United States v. Hunter*, 618 F.3d 1062, 1064 (9th Cir. 2010). The primary and overarching goal of the MVRA "is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." *United States v. Gordon*, 393 F.3d 1044, 1053 (9th Cir. 2004) (internal quotations and citation omitted).

Restitution for each victim in this case is listed in paragraph 115 of the PSR and totals $1,642,133.87. The $94,361.04 due to the IRS for the employment taxes is already reflected in the restitution amount listed for the adoption agency. However, the loss figure listed for the IRS includes $60,885.39 in penalties and interest on the employment taxes due the Internal Revenue Service (PSR ¶¶ 35-38; 115).[4]

---

[4] It is appropriate for the Court to order penalties and interest on the employment taxes due to the IRS, since these losses are the direct and proximate result of defendant's willful failure to account for and pay over withholding and FICA taxes. *United States v. Eyraud*, 809 F.3d at 466.

Defendant has only one objection to the restitution figure in the PSR, and it is to the $123,900 restitution amount due to Travelers Casualty and Surety Company. Defendant repaid $30,000 of the restitution amount to Travelers in October 2019 and has provided proof of that payment. Consequently, the restitution owed to Travelers is $93,900. The government has no objection to this change.

Pursuant to both the Mandatory Victim Restitution Act of 1996 (MVRA), 18 U.S.C. §§ 3663A-3664 and the plea agreement, the government respectfully requests that the Court order restitution to the victims listed in paragraph 115 of the PSR in the amounts listed therein (minus the $30,000 reduction to Travelers) for total restitution of $1,612,133.87. The government will submit under seal, a list of victims, their addresses, and the amounts owed to them prior to sentencing.

## VII.    SPECIAL CONDITIONS OF RELEASE

The PSR author suggests several special conditions of supervised release that the Court should impose. In *United States v. Goddard*, 537 F.3d 1087, 1089 (9th Cir. 2008) (citation omitted), the Ninth Circuit determined that "[a] district court has discretion to order special conditions of supervised release pursuant to § 3583(d) if the conditions are reasonably related to the factors set forth in 18 U.S.C. § 3553(a)." "[C]onditions are permissible if they are reasonably related to the goals of deterrence, protection of the public, or rehabilitation of the offender, taking into account the offender's history and personal characteristics, and involve no greater deprivation of liberty than is reasonably necessary for the purposes of supervised release." *Id*.

/ / /

Defendant objects to Special Condition #7 and Special Condition #10 mentioned in the PSR. Special Condition #7 states, "You must not possess and/or use computers (as defined in 18 U.S.C. § 1030(e)(1)) or other electronic communications or data storage devices or media except as approved in advance by the probation officer." Special Condition #10 provides, "You must not work in any type of employment without the prior approval of the probation officer." Relying on *United States v. LaCoste*, 821 F.3d 1187, 1190-91 (9th Cir. 2016), defendant maintains that Special Conditions #7 and #10 impose a total ban on computer use and employment, and are not reasonably related to the nature and circumstances of the offense, the history and characteristics of the defendant, or the sentencing-related goals of deterrence, protection of the public, or rehabilitation.

With respect to Special Condition #7, the government believes that restricting defendant's use of computers is reasonably related to the offense of conviction. Defendant's use of the computer to transfer the stolen money, alter the adoption agency's QuickBooks, create phony adoption agency documents, and apply for the loans was integral to her wire fraud scheme. She couldn't have carried out the scheme without using the agency's computer. Consequently, it is important for purposes of protecting the public that defendant's computer use be monitored. The government believes that the sentencing-related goals of deterrence and protection of the public can be achieved with the imposition of Special Condition #5 – requiring defendant to provide complete and truthful information to the Probation Officer regarding all computer hardware and software; and Special Condition #6 – requiring defendant to submit to the reasonable computer search provision. Defendant does not object to these special conditions.

/ / /

Consequently, the government does not believe that imposition of Special Condition #7 is necessary.

The government believes that Special Condition #10 is also reasonably related to defendant's wire fraud conviction and is designed to protect a future employer of defendant from becoming her potential victim. However, the sentencing-related goals of deterrence and public protection can also be achieved through imposition of the standard condition requiring defendant to notify her Probation Officer of any changes in where she works or anything about her work, such as the position or the job responsibilities. Consequently, the government will not be requesting imposition of Special Condition #10.

## VIII. CONCLUSION

In a stunning breach of trust, Melodie Eckland stole money from the adoption agency, its' owners, PayPal, Premier Community Bank, and the estate of her deceased brother-in-law. She stole the identity of her employer to cash business checks for her personal use, used the credit card of another adoption agency owner to run up charges, and manipulated the adoption agency's business books and records to cover her embezzlement. She failed to pay the withholding and FICA taxes of the agency to the IRS and failed to report her stolen income on her personal tax returns. Defendant's conduct was extremely egregious, both in terms of the nature of the acts and omissions, and the long time-period over which they occurred. Her actions resulted in substantial financial loss and emotional hardship to her victims. Defendant did all this to satisfy her avarice and sense of entitlement. The defendant must now finally face the consequences of her actions.

/ / /

The government respectfully recommends that the Court impose a sentence of 37 months imprisonment on Counts 1, 3, and 4, and a mandatory consecutive 24-month term of imprisonment on Count 2, for a total of prison term of 61 months; a three-year term of supervised release subject to the standard conditions and special conditions (exclusive of special condition #7 and special condition #10) as set forth in the PSR; a $400 fee assessment; and payment of restitution to the victims in the amount of $1,612,133.87. The government will submit under seal, a separate list with the names of the victims, their contact information, and the amounts of restitution due to each.

Dated: January 12, 2022                    Respectfully submitted,

                                           SCOTT ERIK ASPHAUG
                                           United States Attorney


                                           */s/ Claire M. Fay*
                                           CLAIRE M. FAY, DCB # 358218
                                           Assistant United States Attorney